<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NISSAN MOTOR ACCEPTANCE CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> INFINITI OF ENGLEWOOD, LLC *et al.*, <br><br> Defendants. | Case No. 18cv17228 (EP) (MAH) <br><br> **OPINION** |

**PADIN, District Judge.**

This is a dispute between car dealers, manufacturers, and lenders. Defendant Nissan North America moves for summary judgment in two cases that were consolidated with this case: *Infiniti of Englewood, LLC et al v. Nissan North America, Inc.*, Civ. A. No. 19-8806 ("Dealers Case") and *Infiniti of Englewood, LLC v. Nissan North America, Inc.*, Civ. A. No. 19-16168 ("Englewood Case"). D.E. 308 ("Mot."). The Court decides the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L.Civ.R. 78(b). For the reasons below, the Court will **DENY** the motion.

## I.   BACKGROUND

### A.  Factual Background

Nissan North America ("NNA") distributes Nissan and Infiniti motor vehicles, parts, and accessories in the United Sates "through a network of authorized dealers under the terms of a standardized Dealer Sales and Service Agreement and Standard Provisions incorporated by reference therein" ("Dealer Agreements"). Mot. at 3-4. Three Dealer Agreements are at issue in this case: (1) Infiniti of Englewood, LLC's ("Englewood"); (2) Nissan of Hawthorne, LLC's ("Hawthorne"); and (3) Elite Nissan of Bergenfield, LLC's ("Bergenfield") (collectively,

"Dealers"). *Id.* at 4. John Stefanidis was the Dealers' principal owner. *Id.* James Demetrakis was the co-owner of Hawthorne and Bergenfield. *Id.* at 15.

Each Dealer Agreement incorporated standard provisions requiring the Dealer to "at all times during the term of th[e] [Dealer] Agreement have [satisfactory] flooring arrangements (wholesale financing) . . . with a financial institution acceptable to [NNA], and which will enable Dealer to fulfill its obligations under this [Dealer] Agreement"; a failure to do so was grounds for termination. *Id.* at 4-5 (internal quotation marks omitted) (citing D.E. 308-6 ("Infiniti Standard Provisions") as applicable to Englewood and D.E. 308-7 ("Nissan Standard Provisions") as applicable to Hawthorne and Bergenfield). NNA could also terminate the Dealer Agreement if the Dealer failed to open its facilities for business or to conduct the dealership operations required by the Dealer Agreement for seven consecutive days. *Id.* at 5 (citing Infiniti Standard Provisions and Nissan Standard Provisions).

On December 11, 2018, Nissan Motor Acceptance Company ("NMAC"), the Dealers' floorplan lender, "conducted an audit and discovered that Dealers had transferred or sold hundreds of vehicles without repaying NMAC the loan provided to purchase them; a practice known in the industry as 'sales out of trust.'" *Id.* at 1, 25. NMAC suspended the Dealers' floorplan financing effective immediately and notified NNA. *Id.* at 6. NNA then delivered a notice of default to each Dealer,[1] advising that the Dealer must establish proper floorplan financing within 10 days. *Id.* No Dealer did so, and NNA considered these failures to maintain floorplan financing material breaches of the Dealer Agreements. *Id.* at 1, 6. On December 26, 2018, NNA delivered each Dealer a notice of NNA's intent to terminate the Dealer Agreement, citing the failure to maintain floorplan financing, effective 60 days after receipt of the notice. *Id.* at 6-7.

---

[1] December 13, 2018, to Englewood; December 14, 2018, to Hawthorne and Bergenfield.

**B. Procedural Background**

*1. The Dealers Case*

Dealers filed suit against NNA on February 21, 2019, bringing three claims. *Id.* at 7. Counts One and Two allege that NNA violated provisions of the New Jersey Franchise Practices Act ("NJFPA"). *Id.*; *see also* N.J. STAT. ANN. ("NJSA") §§ 56:10-1, *et seq.* Specifically, Count One alleges that NNA violated NJSA § 56:10-7.4(g), which prohibits "any motor vehicle franchisor, directly or indirectly," to "'require or attempt to require a motor vehicle franchisee'" to: (1) "'order or purchase a new or used motor vehicle" or (2) "'accept delivery of any motor vehicle . . . which is not as ordered by the motor vehicle franchisee . . . .'" D.E. 322 ("Opp'n") at 2 (quoting NJSA § 56:10-7.4(g)) (an industry practice knowing as "stuffing"). Dealers argue that NNA "stuffed Dealers['] inventory with unwanted and unauthorized vehicles, going so far as to go into the Dealer's computer system and order[] vehicles after the dealership was closed so that NNA could reach it[s] sales goals for that month." *Id.*

Count Two alleges that NNA violated NJSA § 56:10-5, which prohibits NNA from terminating the Dealer Agreements "without 'good cause.'" Mot. at 11 (quoting NJSA § 56:10-5). Dealers argue that NNA did not have good cause to terminate the Dealer Agreements because NNA's illegal practice of requiring Dealers to accept unwanted vehicles "made it impossible for Dealers to repay their loans to NMAC" and maintain floorplan financing. Opp'n at 2.

Lastly, Count Three alleges that NNA breached the implied covenant of good faith and fair dealing by stuffing Dealers' inventory without knowledge or authorization, threatening Dealers into accepting vehicles, and requiring Dealers to take unwanted and unpopular vehicles to satisfy NNA's sales goals. *Id.* at 12; Mot. at 11.

3

As a result of filing the Dealers Case, "Dealers obtained an automatic stay of the termination of their Dealer Agreements[,]"[2] which "remains in place to this day."  Mot. at 7.

On July 8, 2020, NNA sent supplemental termination notices to Hawthorne and Bergenfield, citing failures to maintain their dealerships open for business for seven consecutive days.  *Id.* at 9.  Hawthorne and Bergenfield sought leave to file a Supplemental Complaint, which was granted.  *See* D.Es. 155, 170.  The Supplemental Complaint added additional arguments under Count II that NNA lacked good cause to terminate Hawthorne and Bergenfield's Dealer Agreements on this basis because NNA's actions caused these failures.  Mot. at 9.

### 2.  *The Englewood Case*

On May 15, 2019, Englewood was evicted from its premises for failure to pay rent, and consequently ceased operations.  *Id.* at 8.[3]  On May 20, 2019, Englewood requested a temporary relocation, which NNA denied because (1) New Jersey law requires that Englewood give prior notice to other nearby Infiniti dealers and (2) Englewood did not explain "how it intended to satisfy the reasonable facilities standards under the Dealer Agreement with another dealer operating at the same location."  *Id.* (internal quotation marks omitted).  On May 24, 2019, Englewood again requested to relocate, this time within two miles of its previous location; again, NNA denied the request, this time because Englewood "ha[d] not identified any permanent location . . . ."  *Id.* (internal quotation marks omitted).

---

[2] NJSA § 56:10-30(a) provides that "[u]pon timely institution of an action . . . to enjoin the termination of a motor vehicle franchise on the ground that such termination would be in violation of [the NJFPA], the termination shall be automatically stayed pending the final disposition of such action or proceeding . . . ."

[3] Englewood states that it was "involved with a dispute with its landlord and in fact sued the [l]andlord for a wrongful eviction."  Opp'n at 15.

On June 3, 2019, NNA sent Englewood a supplemental notice of termination, citing a failure to maintain its dealership open for business for seven consecutive days. *Id.* at 9. Englewood then filed suit on July 26, 2019, bringing four claims. *Id.* Counts One through Three allege violations of the NJFPA. Specifically, Count One alleges that NNA violated NJSA § 56:10-30(a), which prohibits NNA from denying Englewood "all rights and privileges of a franchisee" "upon timely institution of an action[,]" here, the previously filed Dealers Case, "to enjoin the termination of a motor vehicle franchise on the ground that such termination would be in violation of [NJFPA]." NJSA § 56:10-30(a); Mot. at 11. Englewood alleges NNA violated this provision by declining its request to relocate. Mot. at 11. Count Two alleges that NNA's rejection of Englewood's request to relocate also violated NJSA § 56:10-13.1, which prohibits a motor vehicle franchisor from prohibiting or restricting a franchise's relocation except in specified circumstances.[4] *Id.* at 11. Count Three alleges that NNA lacked "good cause" to terminate the Dealer Agreement based on a failure to operate, in violation of NJSA § 56:10-5. *Id.* And Count Four alleges that NNA breached the implied covenant of good faith and fair dealing in terminating the Dealer Agreement for failure to remain open for at least seven consecutive business days because NNA caused this failure. *Id.*

### 3. *The consolidated cases*

On December 14, 2018, NMAC, Dealers' floorplan lender, filed suit against the Dealers and other Defendants, which involves claims and counterclaims stemming from similar facts.

---

[4] (1) "the relocation will leave that franchisor without representation in the primary market area of the relocating motor vehicle franchisee;" (2) "the relocation will have a material adverse effect on an existing motor vehicle franchisee;" (3) "the place of business to which the motor vehicle franchisee proposes to relocate does not substantially satisfy the reasonable standards for franchise facilities established by the motor vehicle franchisor in writing and made available to its franchisees;" or (4) "the relocation is determined to be injurious pursuant to [NJSA] 56:10-16 *et seq.* . . . ." NJSA § 56:10-13.1.

D.Es. 1, 310.  On September 11, 2019, Dealers and the other Defendants moved to consolidate that case with the Dealers Case and the Englewood Case, which was granted on November 18, 2019. D.Es. 102, 111.

On September 9, 2022, NNA moved for summary judgment on all claims against it in the Dealers Case and the Englewood Case.  *See generally* Mot.  Dealers opposed.  *See generally* Opp'n.  NNA replied.  *See generally* D.E. 334 ("Reply").

## II.   LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over nonmaterial facts will not preclude a court from granting a motion for summary judgment.  *See id.*

The moving party has the initial burden of showing the basis for its motion and demonstrating that there is an absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party must support its motion by citing to specific materials in the record.  Fed. R. Civ. P. 56(c)(1)(A).

If the moving party adequately supports its motion, then the burden shifts to the nonmoving party to "go beyond the pleadings" and designate specific facts on the record that demonstrate a genuine dispute for trial exists.  *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted).  The nonmoving party must identify specific facts and affirmative evidence that contradict the moving party.  *Anderson*, 477 U.S. at 250.  If the nonmoving party fails to provide such evidence,

or where the "evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50). However, "[i]f reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250-51.

In deciding a motion for summary judgment, a court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). But if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case[,]" then there is "no genuine issue as to any material fact[,]" and summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 322.

## III.   ANALYSIS

### A. There is a Genuine Dispute of Material Fact as to Whether NNA Required or Attempted to Require Dealers to Accept Unwanted Vehicles

NNA seeks summary judgment on Count One in the Dealers Case. Mot. at 12. Count One alleges that NNA violated NJSA § 56:10-7.4(g), which prohibits "any motor vehicle franchisor, directly or indirectly," to "'require or attempt to require a motor vehicle franchisee'" to: (1) "'order or purchase a new or used motor vehicle" or (2) "'accept delivery of any motor vehicle . . . which is not as ordered by the motor vehicle franchisee . . . .'" Opp'n at 2 (quoting NJSA § 56:10-7.4(g)). NNA argues that there is no genuine dispute of material fact as to this count because there is no evidence that NNA "require[d]" or "attempt[ed] to require" the Dealers to accept unwanted vehicles. Mot. at 12. The Dealers object. Opp'n at 8.

7

What it means for a franchisor to "require" a franchisee to receive unwanted vehicles under the NJFPA is an issue of first impression. *See* Mot. at 12; Opp'n at 4. NNA argues the Court should look at the plain language of the statute and defines "require" as "to demand as necessary or essential" or "to impose a compulsion or command on." Mot. at 13.[5] NNA then analogizes the NJFPA's language to a similar federal statute: the Automobile Dealer Day in Court Act ("ADDCA"), 15 U.S.C. § 1221(e), which prohibits a franchisee from "coerc[ing]" a franchisor into purchasing unwanted vehicles. *Id.* NNA claims that there is no meaningful difference between the words "coerce" and "require" because both involve "forced conduct"; as such, the Court should apply other courts' interpretations of what it means to "coerce." *Id.*; Reply at 3. If the Court were to agree, then Dealers must offer facts as to forced conduct through intimidation or threats. Mot. at 13; *see Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 326 (3d Cir. 2001) (actionable ADDCA conduct "occurs only when the automobile manufacturer makes a wrongful demand" that, "if not complied with[,]" "will result in sanctions"). Conversely, Dealers argue that to "coerce" implies conduct beyond to "require"—namely, that to "coerce" involves a wrongful demand and/or threats, whereas to "require" does not. Opp'n at 5.

The Court agrees with Dealers. To determine the Legislature's intent when drafting the NJFPA, the Court must "look to the statute's language and give those terms their plan and ordinary meaning." *State v. J.V.*, 242 N.J. 432, 442 (2020). The definition of "coerce" that NNA cites to is among other definitions that include words like "force," "threat," "dominate," and "restrain."[6]

---

[5] Citing to Merriam Webster, *require*, https://www.merriam-webster.com/dictionary/require (last visited June 14, 2023).

[6] Merriam Webster, *coerce*, www.merriam-webster.com/dictionary/coerce (last visited June 14, 2023).

Notably, these words, or any equivalent, are not present in the definition of "require."[7] These qualifying words to define "coerce" suggest, like Dealers argue, that coercion implies additional conduct beyond require, such as wrongful force or threats.  The Court will not "write in an additional qualification [that] the legislature pointedly omitted in drafting its own enactment." *DiProspero v. Penn*, 183 N.J. 477, 492 (2005).  Accordingly, the Court will not consider presence of threats or intimidation a material fact for this NJFPA claim.

NNA argues it is undisputed it did not require Dealers to accept unwanted vehicles because (1) there is no evidence of stuffing for any three Dealers and (2) Dealers were expressly offered to return any unwanted vehicles, but never did. Mot. at 14-16; Reply at 4-5.

1.  *There is a genuine dispute of material fact as to whether NNA required or attempted to require Hawthorne and Bergenfield to accept unwanted vehicles*

As to Hawthorne and Bergenfield, NNA argues it is undisputed that it did not require these Dealers to accept unwanted vehicles because (1) there is no evidence of stuffing as to *any* of the three Dealers and (2) these two Dealers were expressly offered to return any unwanted vehicles, but never did.  Mot. at 14-16; Reply at 4-5.  NNA argues "those dealerships tacitly admitted that the only evidence they had concerning supposedly 'stuffed' vehicles consisted of a series of 2016 text messages exchanged between Scott Cohn, NNA's District Operations Manager, and Dragan Jakovljevic, the manager at the Hawthorne and Bergenfield stores responsible for ordering vehicles for those dealerships."  Mot. at 14-15.  NNA claims these texts are not enough to show a genuine dispute of material fact because "th[e] text messages actually show Mr. Cohn expressly offered to allow Hawthorne and Bergenfield to cancel any vehicles they did not want to accept."  *Id.* at 15;

---

[7] *See* Merriam Webster, *supra* n.6 (providing the following definitions of "require": "to claim or ask by right and authority" or "request"; "to call for as suitable or appropriate" or "to demand as necessary or essential[,] have a compelling need for"; "to impose a compulsion or command on[,] COMPEL"; and "to feel or be obliged").

*see also* D.E. 308-25 ("Cohn Depo.") at 93:19-25 (Cohn stating that after telling Dealers an order was "placed on their behalf," Dealers "ha[ve] the ability to cancel those orders.").

In response, Dealers cite to the following exchanges between Cohn and Jakovljevic: (1) a text from Cohn that he was getting "'crushed' for not hitting his order fulfillment[,]" and a text where Cohn stated he was placing twenty vehicles into Hawthorne and Bergenfield's inventory; (2) a text from Cohn that he "just assigned 10 [Nissan] Sentras to [Bergenfield]…I had to…they were about to go"; (3) a text from Jakovljevic complaining about Cohn stuffing over $1 million of inventory without proper approval, to which Cohn responded, "F***ing cancel, and don't hit your numbers. I don't give a f**k"; and (4) an email from Cohn that not taking 130 vehicles from NNA's inventory would be "the death of me…and you!!!"  Opp'n at 9 (citing D.Es. 326-13, 326-14).

NNA argues these messages cannot be construed as threats because "at most" Cohn "warned" Jakovljevic "that the Bergenfield and Hawthorne dealerships risked not hitting sales objectives if they did not have sufficient inventory, and expressly offered to cancel any orders . . . ."  Reply at 6.  Additionally, NNA argues that Cohn's text that Jakovljevic "refusal to accept certain vehicles . . . would be 'the death of me . . . and you!!!'" was "obvious hyperbole, and Dealers cannot seriously suggest" that the text was meant to "express[] fear" that either party "would suffer death if the . . . dealerships did not accept these vehicles." *Id.* n.1.  NNA also claims that Stefanidis[8] knew of a process to return vehicles, testified to by Jeffrey Liebler, the general manager of Englewood, who stated that they could "basically call [their] rep up and say get this thing out of here."  Reply at 4 (citing 325-14 ("Liebler Dep.") at 30:21-22).

---

[8] NNA also argues that the Court should disregard Stefanidis' declarations, cited in Dealers' opposition, because statements made must be based on personal knowledge and cannot be legal conclusions.  Reply at 2.  However, NNA does not explain how that rule applies here.

Dealers have demonstrated a genuine dispute of material fact as to whether NNA "require[d] or attempt[ed] to require" Bergenfield and Hawthorne to accept unwanted vehicles in violation of the NJFPA.  In a summary judgment motion, it is not the Court's role to weigh NNA's evidence against the Dealers' evidence; that is an issue for the factfinder at trial.  *Marino*, 358 F.3d at 247.  When making all reasonable inferences in favor of Dealers, a reasonable juror could find Cohn's text messages stating he was assigning vehicles not requested by Bergenfield or Hawthorne; using expletive language to convey messages regarding inventory and sales numbers; and using the phrase "the death of me," which is an idiom "often used figuratively [to] suggest[] concern or frustration[,]"[9] amounted to requiring or attempting to require those two Dealers to accept unwanted vehicles.  Additionally, even if a return procedure existed, a reasonable juror could find that this option was strongly discouraged.

2. *There is a genuine dispute of material facts as to whether NNA required or attempted to require Englewood to accept unwanted vehicles*

As to Englewood, NNA cites Liebler's, Englewood's longtime general manager, testimony as evidence that NNA did not require or attempt to require Englewood to receive unwanted vehicles.  Mot. at 14.  First, NNA cites Liebler's testimony that NNA never knowingly delivered any vehicles to Englewood that had not been ordered by the dealership.  *Id.* (citing Liebler Dep. at 26:18-25).  Second, NNA cites Liebler's testimony that he never received threats from NNA that "certain action" would be taken against Englewood if the dealership did not accept already allocated vehicles or vehicles that NNA encouraged the dealership to take.  *Id.* (citing Lieber Dep. at 32:16-21).  In response, the Dealers cite to evidence that NNA routinely placed unauthorized

---

[9]    Merriam    Webster,    *be    the    death    of*,    www.merriam-webster.com/dictionary/be%20the%20death%20of.

orders on all the Dealers' systems and that Liebler was aware of the threats made to Jakovljevic. Opp'n at 5, 7-8; *see also* Liebler Dep. at 32:22-33:11.

There is a genuine dispute of material fact as to whether NNA required or attempted to require Englewood to receive unwanted vehicles. A reasonable juror could find that even if no unwanted cars were delivered directly to Englewood, that NNA's conduct in accessing computer systems and the overall culture of threats to comply with NNA's orders, even if no "certain action" was threatened, amounts to, at the least, an attempt to require. *See* NJSA § 56:10-7.4(g).

Accordingly, the Court will **DENY** NNA's motion for summary judgment as to Count I in the Dealers Case.[10]

### B. There is a Genuine Dispute of Material Fact as to Whether Dealers Suffered Damages

NNA seeks summary judgment on all counts in the Dealers Case and the Englewood case. Mot. at 16. NNA argues that summary judgment is warranted because there is no genuine dispute of material fact as to whether Dealers can establish damages, an essential element. *Id.* For both cases, NNA argues that the Dealers have not provided specific damages or explained how NNA's actions caused the damages in either their interrogatories or their expert report; consequently, NNA argues the damages are remote, uncertain, and speculative. *Id.* at 17-19. In the Englewood Case, NNA argues that Dealers' expert's report contained no opinions regarding that case and cites to testimony that the expert was unaware of that case. *Id.* at 20 (citing generally D.E. 308-31 ("Expert Report")). Additionally, NNA argues that any losses Englewood suffered were caused by the landlord evicting it, not NNA's actions. *Id.* Dealers object and state that the expert report

---

[10] Dealers offer different evidence as to whether they were required to accept unwanted vehicles, such as a car rental program initiated by Nissan. Because the Court already finds a genuine dispute of material fact precluding summary judgment, the Court will not address these other bases.

establishes that the Dealers' principals invested over $25 million, which was lost due to NNA's (and NMAC's) wrongful actions, including stuffing vehicles.  Opp'n at 15; *see also* Expert Report at 3.

"A plaintiff has the burden of proving damages and must do so 'with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate.'" *Odi v. Asset Acceptance LLC*, 2013 WL 6223361, at *2 (N.J. Super. Dec. 2, 2013) (unpublished) (quoting *Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C.*, 191 N.J. 1, 14 (2007)).  The damages must also be connected to the alleged misconduct.  *Id.*

The Court finds Dealers demonstrated a genuine dispute of material fact as to whether they suffered damages and whether NNA caused those damages.  Dealers argue that but for NNA's illegal actions, they would not have lost their floorplan financing or failed to operate for seven consecutive days, consequently their Dealer Agreements would not be terminated, and as such, the Dealers and their principals would not have lost money.  Opp'n at 15.  And as established earlier, there is a genuine dispute of material fact as to whether NNA engaged in the illegal conduct.

Accordingly, the Court will **DENY** NNA's motion for summary judgment on all counts in both the Dealers Case and the Englewood Case on this basis.

### C. There is a Genuine Dispute of Material Fact as to Whether NNA had "Good Cause" to Terminate the Dealer Agreements and Whether Dealers' Alleged Breaches Provide a Complete Defense to Actions Under the NJFPA

NNA seeks summary judgment on Count One in the Dealers Case and Count Three in the Englewood Case; both counts argue that NNA lacked good cause to terminate the Dealer Agreements on the reasons NNA cited.  Mot. at 22.  NNA argues that there is no genuine dispute of material fact as to whether it had "good cause" to terminate the Dealer Agreements because

Dealers breached the Dealer Agreements. *Id.* Further, NNA seeks summary judgment on all claims under the NJFPA, arguing that these material breaches provide a complete defense to Counts One and Two of the Dealers Case and Counts One through Three of the Englewood Case.

The NJFPA prohibits a franchisor from "terminat[ing], cancel[ing] or fail[ing] to renew a franchise without good cause." NJSA § 56:10-5. The NJFPA defines "good cause" as "the failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." *Id.* There is "no real or practical difference between a conclusion that a party materially breached a contract, and a conclusion that the party failed to substantially comply with its obligations under a contract." *Gen. Motors Corp.*, 263 F.3d at 317 n.8. Additionally, the "statutory definition of 'good cause' focuses solely on the objective actions of the franchisee . . . and not on the subjective motivations of the franchisor" for terminating the agreement. *Id.* at 321 n.11.

NNA argues that "[i]t is undisputed that Dealers failed to substantially comply with their obligations under the Dealer Agreements in at least two ways: (1) by failing to maintain adequate floorplan financing; and (2) by failing to keep their dealerships open for business for seven consecutive days." Mot. at 23-24; *see also id.* at 24-26 (citing cases supporting that failure to do either is considered a material breach).

Some courts have found a franchisee's material breach of the franchise agreement provides a complete defense to a franchisor for any action brought under the NJFPA. *See, e.g.*, *Mall Chevrolet, Inc. v. Gen. Motors LLC*, 2021 WL 2581665, at *3 (D.N.J. June 23, 2021) (citing *Coast v. Auto. Group, LTD v. VW Credit, Inc.*, 119 F. App'x 419, 423 (3d Cir. 2005)). NNA urges the Court to apply this defense as a bright line rule, arguing that "[t]o hold otherwise would allow a franchisee to treat a franchisor's purported violation of the NJFPA as a proverbial 'get out of jail

free card' . . . ." Mot. at 30. However, when there is a genuine dispute as to whether the franchisor's wrongful conduct preceded, and caused, the franchisee's breach, it is not clear if the defense still applies. *See Goldwell of New Jersey, Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 188 (D.N.J. 2009) (agreeing that a party's actions that occurred *after* the other party repudiated the agreement could not be considered "good cause" for terminating the agreement); *see also id.* at 193 (denying summary judgment where the record was indeterminable as to which party breached first). Indeed, *Mall Chevrolet*, relied on by NNA, explicitly noted that it was not considering the hypothetical where the franchisor first engaged in illegal behavior that then led to a notice of termination, and as a result, the franchisor "reap[ed] the benefits" of its illegal behavior. 2021 WL 2581665, at *4. Rather, "[i]t is only when a franchisee . . . has materially breached the franchise requirements—and thus is not 'innocent'—that the New Jersey legislature does not offer the franchisee those special statutory protections." *Id.*

Here, there is a genuine dispute as to which alleged wrongful conduct came first, subsequently causing other events at issue. Dealers argue that to accept any violation of the Dealers Agreement as good cause to terminate would allow parties like NNA to act with impunity, because franchisors could violate the NJFPA, and the protections afforded to franchisees, to the point of causing a "breach" and face no consequences. Reply at 15. The purpose of the NJFPA is to protect franchisees. *Goldwell*, 622 F. Supp. 2d at 191. If NNA violated the NJFPA and caused Dealers' "failures" under the Dealer Agreements, then allowing NNA to use these "failures" as "good cause" to terminate and as an absolute defense to any future actions would defeat the NJFPA's purpose of the NJFPA and would instead immunize franchisors whose illegal actions were so extreme that franchisees' "breaches" and subsequent terminations became inevitable.

Accordingly, the Court will **DENY** NNA's summary judgment motion to as to the Dealers Case, Counts One and Two, and the Englewood Case, Counts One through Three.

### D. There is a Genuine Dispute of Material Fact as to Whether NNA Breached the Implied Covenant of Good Faith and Fair Dealing

Lastly, NNA seeks summary judgment on Dealers' claims that NNA breached the implied covenant of good faith and fair dealing: Count Three in the Dealers Case and Count Four in the Englewood Case. Mot. at 31. NNA argues that these claims "fail as a matter of law because Dealers may not invoke the implied covenant to impose duties upon NNA beyond those to which the parties actually agreed." *Id.*

In the Dealers Case, Dealers claim that NNA breached this covenant by, among other actions, stuffing vehicles in violation of the NJFPA and seeking to unlawfully terminate the Dealer Agreements. *Id.* NNA argues that Dealers do not allege which "contractual obligation NNA purportedly breached by stuffing Dealers' inventories," NNA never "required" Dealers to accept unwanted vehicles, and NNA had good cause to terminate the Dealer Agreements. *Id.* at 31-32. In Englewood's case, NNA argues that "[n]othing in the Dealer Agreement or the [Infiniti] Standard Provisions guarantees that NNA will approve Englewood's relocation request, and . . . NNA is not contractually required to approve Englewood's request[s] to move . . . before finally settling on an undisclosed permanent location." *Id.* at 34.

NNA claims, and Dealers do not address, that California law applies. *Id.* at 32 n.13 (citing the Infiniti Standard Provisions and Nissan Standard Provisions). New Jersey courts recognize choice-of-law provisions unless they violate public policy, which Dealers do not argue is at issue. *See MacDonald v. CashCall, Inc.*, 883 F.3d 220, 228 (3d Cir. 2018). Thus, the Court will apply California law.

16

California law recognizes that "the implied covenant of good faith and fair dealing applies in all contracts." *Kiewit Power Constructors Co. v. City of Los Angeles by and through Dep't of Water and Power*, 813 Fed. App'x 261, 264 (9th Cir. 2020). This covenant "only protects legitimate expectations of the parties which arise from the contract." *Id.* (internal quotation marks omitted). The covenant supplements the express contract's covenants and prevents one party "from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." *Barker v. Stoli Group (USA), LLC*, 2022 WL 1811087, at *4 (E.D. Cal. June 2, 2022) (internal quotation marks omitted). Further, "where a contract confers one party with discretionary power affecting the rights of the other, a duty is imposed . . . [to not] exercise[] [that] discretionary authority in bad faith . . . ." *McCollum v. XCare.net, Inc.*, 212 F. Supp. 2d 1142, 1152 (N.D. Cal. 2002). Additionally, "breach of a specific provision of the contract is not a necessary prerequisite to a claim for breach of the implied covenant of good faith and fair dealing." *Schwartz v. State Farm Fire and Cas. Co.*, 88 Ca. App. 4th 1329, 1339 (2001).

Here, Dealers argue that NNA terminated the Dealer Agreements and refused to approve Englewood's relocation request in bad faith because NNA's illegal conduct led to the ultimate financial shortcomings, failures, and all alleged breaches by Dealers. Opp'n at 12-13. For the reasons stated above, there is a genuine dispute of material fact as to whether NNA, which holds discretionary power to terminate agreements and reject relocation, violated the NJFPA by illegally stuffing Dealers' inventories with unwanted vehicles and threatening the Dealers into compliance. Drawing all reasonable inferences in favor of Dealers, they have demonstrated a genuine dispute of material fact as to whether NNA exercised its authority in bad faith and frustrated the Dealer Agreements by engaging in illegal activity. *See McCollum*, 212 F. Supp. 2d at 1153 (denying summary judgment where "[t]here are disputed questions of fact from which a fact finder could

conclude that [the defendant's actions] w[ere] intended to frustrate the [p]laintiff's legitimate expectations").

Accordingly, the Court will **DENY** NNA's summary judgment motion on the Dealers Case, Count Three, and the Englewood Case, Count Four.

## IV.   CONCLUSION

For the reasons stated herein, the Court will **DENY** NNA's motion for summary judgment on all counts in both the Dealers Case (*Infiniti of Englewood, LLC et al v. Nissan North America, Inc.*, Civ. A. No. 19-8806) and the Englewood Case (*Infiniti of Englewood, LLC v. Nissan North America, Inc.*, Civ. A. No. 19-16168).  An appropriate Order accompanies this Opinion.


Dated: June 26, 2023

Evelyn Padin, U.S.D.J.