**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NISSAN MOTOR ACCEPTANCE CORPORATION,<br><br>                        Plaintiff,<br><br>            v.<br><br>INFINITI OF ENGLEWOOD, LLC, *et al.*,<br><br>                        Defendants. | Case No. 18cv17228 (EP) (MAH)<br><br>**OPINION** |

**PADIN, District Judge.**

This case involves the breakdown between three car dealerships, their lender, and other parties to various loan documents related to the dealerships and the lender.   Nissan Motor Acceptance Corporation ("NMAC"), the financial lender, filed suit against multiple Defendants, including the three dealerships: Infiniti of Englewood, LLC ("Infiniti Englewood"), Nissan of Hawthorne, LLC ("Nissan Hawthorne"), Elite Nissan of Bergenfield, LLC ("Elite Nissan," and together with Infiniti Englewood and Nissan Hawthorne, "Dealers"); and their principals James D. Demetrakis ("Demetrakis"), John P. Stefanidis ("Stefanidis").   NMAC now moves for partial summary judgment of the Third Amended Complaint ("TAC") (D.E. 224).   NMAC also moves for summary judgment on all of Defendants' counterclaims asserted in their joint Answer to the TAC ("TAC Answer") (D.E. 234).   D.E. 310 ("Mot.").   The Court decides the motion without oral argument.   *See* Fed. R. Civ. P. 78(b); L.Civ.R. 78(b).   For the reasons below, the Court will **DENY** the motion.

## I.    BACKGROUND[1]

NMAC provided lines of credit to authorized Nissan and Infiniti dealerships, including Infiniti Englewood, Nissan Hawthorne, and Elite Nissan, pursuant to separate but identical Automotive Wholesale Financing and Security Agreements ("WFSAs").  Mot. at 2; *see also* TAC ⁋ 34.  This financing was used "to purchase vehicle inventory for retail sale to the public, known in the industry as a dealer's 'floor plan.'"  *Id.*  "NMAC also provides dealers and related entities with capital loans and mortgages on dealership properties."  *Id.*  Under the WFSAs, upon selling vehicles, Dealers were required to "promptly pay" NMAC the amount due in connection with the item sold.  D.E. 312-13 ("Infiniti Englewood WFSA") § 2.3.2.  The WFSAs also granted NMAC "a security interest in all . . . [p]roperty, including all automobiles," that Dealers acquired.  *See, e.g.*, *id.* §§ 2.4-2.4.1.

NMAC also extended credit to Dealers and other Defendants through Capital Loan and Security Agreements ("CLSAs") and mortgages on dealership properties.  Mot. at 2.  Stefanidis and Demetrakis, the Dealers' principals, entered into various guaranty agreements with NMAC, guaranteeing the WFSAs and CLSAs.  D.E. 148 ("Arleo Op.") at 2; *see, e.g.*, D.Es. 312-14 to 23 and 25, D.Es. 313-1 to 17. Each Defendant also entered into at least one cross-guaranty, cross-collateral, and cross-default agreement (collectively, "Cross Agreements"), under which they "guaranteed payment of the debts of each other Defendant, agreed that a default on any one of Defendants' debts to NMAC [would] constitute[] a default under each other debt, and permitted

---

[1] This section derives from the parties' pleadings and briefings and Judge Arleo's previous Opinion on all Defendants' motion to dismiss (D.E. 148).  Many of the background facts are undisputed.  Rather, the dispute lies with additional facts alleged by Defendants in their counterclaims that, if true, impact the legal analyses and outcomes of the claims.  NMAC argues that Defendants admitted many of NMAC's facts and allegations, providing a chart for the Court. *See* D.E. 335 at 1-4.  The Court will determine which disputed and undisputed facts are material. *See* Fed. R. Civ. P. 56(a).

NMAC to use the collateral specified in any one of the other loan agreements with NMAC to satisfy a debt under any other such agreement." *Id.*

### A. Factual Background to the Claims

In December 2018 and January 2019, NMAC audited Dealers and found that they "had sold hundreds of vehicles without paying NMAC, a practice known in the industry as 'selling out of trust.'" Mot. at 3. NMAC demanded payment for the SOT vehicles, which Defendants failed to pay in full. *Id.* NMAC considered this a default, and pursuant to the various Cross Agreements, accelerated all amounts owed under the various loan documents. *Id.* NMAC claims that Defendants have "failed to honor their contractual obligations" to either repay NMAC or repay the indebtedness of others to NMAC. *Id.* at 2.

NMAC also claims that "Defendants engaged in various schemes to enrich themselves at NMAC's expense." *Id.* at 3. Specifically, in 2018, Stefanidis and Demetrakis "withdrew and transferred to their own personal accounts $20 million from Dealers despite NMAC's preferred first-position security interest in . . . Dealers' funds." *Id.* at 3.

### B. Factual Background to the Counterclaims

In 2011, Nissan's global chief executive, Carlos Ghosn, implemented "Power 88," a plan to increase Nissan's global market share. D.E. 333 ("Opp'n") at 1. To assist with increasing sales, NMAC and Nissan North America, a manufacturer who distributes Nissan and Infiniti motor vehicles, parts, and accessories to Dealers, created a car rental program ("Rental Program"). *Id.* Dealers joined the Rental Program in January 2014. TAC Answer ⁋ 55. "In November 2014, the Dealers uncovered a criminal scheme by a former employee that resulted in the loss of approximately 150 vehicles from [Nissan] Hawthorne and [Infiniti] Englewood." *Id.* ⁋ 57. NMAC and its Director of Credit Services, Brian Barrett, then allegedly "insisted that . . . Dealers had to

cease rental car operations and purchase their entire 300 car fleet and put them into used car inventory." *Id.* ¶¶ 58-59. Barret then "promised" in return that "NMAC would provide a special line of credit to . . . Dealers . . . since buying such a large quantity of vehicles at one time would push the Dealers over their floorplan limit." *Id.* ¶ 60. Instead, NMAC put Dealers on "special credit." *Id.* ¶ 62.

Infiniti Englewood and Nissan Hawthorne filed insurance claims, "including the ones NMAC required them to deal with while participating in the rental program[,]" and were denied. *Id.* ¶ 68-69. Consequently, Infiniti Englewood and Nissan Hawthorne filed suit against the carriers and NMAC seeking payment of the claims ("Insurance Lawsuit"). *Id.* ¶ 69. Then, in the summer of 2017, Stefanidis, Demetrakis, and Jeff Liebler, Infiniti Englewood's General Manager, met with Barrett and Mark Kaczynski, former NMAC president, at a Manhattan restaurant, where Barrett and Kaczysnki allegedly "pressured" the other parties to drop NMAC from the Insurance Lawsuit and to make a $7 million curtailment payment[2] on aging inventory in return for various financial assistance. *Id.* ¶¶ 71, 72. Among these alleged promises were: (1) to have the carriers pay the claims directly to Infiniti Englewood and Nissan Hawthorne; and (2) to give Dealers a capital loan to refinance a portion of the floor plan, increase the used floor plan lines, and take them off Special Credit. *Id.* ¶¶ 71-74. The parties entered into a Forbearance Agreement dated July 20, 2017 ("Forbearance Agreement"), which stated that NMAC would be dropped form the lawsuit and Defendants would make the $7 million curtailment payment. *Id.* ¶ 77. Defendants claim that NMAC did not honor its promises made at the restaurant. *Id.* ¶ 78.

---

[2] This "curtailment" would bring the outstanding loans on the inventory in line with market value. *Id.* ¶ 71.

Additionally, Defendants allege that NMAC "routinely" required Dealers to accept unwanted vehicles in their inventory, a practice known as "stuffing." *Id.* ⁋ 87. According to Defendants, Dealers were threatened into complying, mainly from NNA's District Manager. *Id.* ⁋⁋ 88-93. NMAC "directly benefitted from NNA's stuffing through higher interest charges and other fees it collected from the Dealers." *Id.* ⁋ 100.

### C. Procedural History

NMAC filed this case on December 14, 2018. D.E. 1. On September 11, 2019, Dealers and the other Defendants moved to consolidate this case with two other cases involving Dealers and NNA, which was granted on November 18, 2019. D.Es. 102, 111. NMAC filed its Second Amended Complaint on October 7, 2019, asserting twelve causes of action against Defendants. D.E. 107 ("SAC"). Defendants answered on October 21, 2019, asserting six counterclaims. D.E. 112. On November 20, 2019, NMAC moved dismiss the counterclaims, which was denied except as to a New Jersey Franchise Practices Act counterclaim, irrelevant to this instant motion. *See generally* Arleo Op.

NMAC moved for summary judgment on September 9, 2022, on its Conversion claim (Count Three), Breach of Contract claim (Count Four), Breach of the Implied Covenant of Good Faith and Fair Dealing claim (Count Five), Judicial Foreclosure claim (Count Six), Breach of Fiduciary Duties/Express Trust (Count Twelve), and Fraudulent Transfer (Count Thirteen). *See* Mot. NMAC also moved for summary judgment on Defendants' Fraudulent Inducement counterclaim (Counterclaim One), Equitable Fraud counterclaim (Counterclaim Two), Breach of Contract counterclaim (Counterclaim Three), Breach of the Implied Covenant of Good Faith and Fair Dealing counterclaim (Counterclaim Four), and Promissory Estoppel counterclaim

(Counterclaim Five).  *Id.*  Defendants oppose.  *See* Opp'n.  NMAC has replied.  D.E. 335 ("Reply").

## II.   LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over nonmaterial facts will not preclude a court from granting a motion for summary judgment.  *See id.*

The moving party has the initial burden of showing the basis for its motion and demonstrating that there is an absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party must cite specific materials in the record. Fed. R. Civ. P. 56(c)(1)(A).

If the moving party adequately supports its motion, then the burden shifts to the nonmoving party to "go beyond the pleadings" and designate specific facts on the record that demonstrate a genuine dispute for trial exists.  *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). Specifically, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party.  *Anderson*, 477 U.S. at 250.  If the nonmoving party fails to provide such evidence, or where the "evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment."  *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50).  However, "[i]f reasonable minds

could differ as to the import of the evidence," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250-51.

In reviewing a motion for summary judgment, a court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). But even if material facts remain disputed, if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case[,]" then there is "no genuine issue as to any material fact[,]" and summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 322.

## III.    ANALYSIS

### A.  The Court Will Not Dismiss NMAC's Allegedly Non-Germane Claims

Defendants argue that New Jersey Court Rule ("NJCR") 4:64-5 bars NMAC from pursuing any non-germane claims to NMAC's foreclosure action. Opp'n at 4. Specifically, this rule provides that "[u]nless the Court otherwise orders[,] . . . claims for foreclosure of mortgages shall not be joined with non-germane claims against the mortgagor or other persons liable on the debt. . . . Non-germane claims shall include, but not be limited to, claims on the instrument of obligation evidence the mortgage debt, assumption agreements[,] and guarantees." NJCR 4:64-5. This rule codifies part of New Jersey's entire case or controversy doctrine. *Coleman v. Chase Home Fin., LLC*, 446 Fed. App'x 469, 471-72 (3d Cir. 2011). Defendants argue that the Court should *sua sponte* dismiss essentially all claims from the TAC except for Count Six, the foreclosure claim. Opp'n at 4-5 (citing *Coleman*, 446 Fed. App'x at 471-72; *Zebrowski v. Wells Fargo Bank, N.A.*, 2010 WL 2595237, at *6 (D.N.J. June 21, 2010)).

NMAC argues, and the Court agrees, that these cases are disanalogous.  Both *Coleman* and *Zebrowski* involved procedural histories with prior foreclosure proceedings, where the Court found that the claims should have been raised in that proceeding rather than the current proceeding. *Zebrowski*, 2010 WL 2595237, at *6; *Coleman*, 446 Fed. App'x at 472.  Further, this doctrine requires "equitable considerations" and is determined "on a case-by-case basis." *Coleman*, 446 Fed. App'x at 472.  Beyond claiming NMAC's other claims are non-germane, Defendants offer no reasons in support.  In fact, Defendants often highlight throughout their brief the complex, interwoven nature of the claims and counterclaims at hand.  *See, e.g.*, Opp'n at 12 (arguing that the claims and counterclaims in this case are "inextricably intertwined").  Without any support as to why the claims are non-germane to this action, the Court will not strike any of NMAC's claims. *See Kimmel v. Phelan Hallinan & Schmieg, PC*, 847 F. Supp. 2d 753, 764 (E.D. Pa. 2012) (applying New Jersey law and declining to find claims non-germane where the allegations otherwise were conclusory).

### B. NMAC Does Not Support its Summary Judgment Motion on its Conversion Claim (Count Three)

NMAC's preliminary statement (Mot. at 1) states NMAC will seek summary judgment as to its conversion claim (Count Three).  However, beyond mentioning this in the preliminary statement, NMAC makes no other reference or argument as to why summary judgment is warranted.  *See generally* Mot.; Reply.  Accordingly, the Court will **DENY** summary judgment motion on NMAC's conversion claim (Count Three) for failure to put forth evidence as required by Fed. R. Civ. P. 56(c)(1)(A).  *See Celotex Corp.*, 477 U.S. at 323.

**C. There is a Genuine Dispute of Material Fact as to Whether Defendants Breached the WFSAs, and Consequently, the Loan and Guaranty Agreements (Count Four, Counterclaim Three)**

NMAC seeks summary judgment on its Breach of Contract claim (Count Four) and Defendants' Breach of Contract counterclaim (Counterclaim Three). To state a claim for breach of contract under New Jersey law, a party must allege: (1) a contract between the parties, (2) a breach of that contract, (3) damages resulting from the breach, and (4) that the party claiming a breach performed its own contractual obligations. *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 160 (3d Cir. 2018).

Here, there are conflicting breach of contract claims. NMAC argues that Dealers breached the WFSAs when they sold vehicles out of trust and then defaulted on payments. Mot. at 6. This provision provided that "with respect to wholesale payoffs, outstanding balances on sold units must be received by NMAC within ten calendar days from the date of sale or two business days from the date on which Dealers receive funding, whichever occurs first." *Id.* at 8-9. Second, NMAC argues that once Dealers defaulted and NMAC exercised its right to accelerate the amounts due under other various loan and guaranty agreements, those parties breached by failing to repay the debt. *Id.* at 6.

However, Defendants argue that Dealers did not breach the WFSAs because the past course of conduct between Dealers and NMAC waived the prompt performance provision. Opp'n at 9. Specifically, Defendants claim that NMAC waived the right to demand "prompt" payment as defined by the WFSAs because "NMAC knew the sale date, and floorplan payoff date, of substantially all the vehicles sold by Dealers[,]" and NMAC "[a]llow[ed] Dealers to operate 'out of trust' and accept[ed] 'late' payments from the Dealers without question . . . ." *Id.* (citing D.E. 326 ("Stefanidis Dec.") ⁋ 56). Defendants then argue that NMAC breached the WFSAs by

"making the 24 hour pay-off demand" that Dealers were required to repay *all* vehicles within 24 hours. *Id.* at 10.  Defendants claim that "[h]ad NMAC demanded payment for only those vehicles actually requiring payment, the demand would have been satisfied[,]" and consequently, the default cross-provisions in the other agreements would not have been triggered.  *Id.* at 10-11.

A contractual provision is considered waived "when a promisor manifests the intent not to require a promise to strictly comply with a contractual duty."  *Innospec Fuel Specialties, LLC v. Isochem N. Am., LLC*, 2012 WL 3682988, at *4 (D.N.J. Aug. 24, 2012) (collecting cases).  NMAC argues that course of conduct could not alter the WFSAs because they provided that "[n]o waiver shall be effective against NMAC unless written and signed by an executive officer of NMAC."  Mot. at 9 (internal quotation marks omitted).  However, even a contract provision that requires modification by writing "'may be expressly or impliedly waived by the clear conduct or agreement of the parties or their duly authorized representatives.'"  *Vincent Pools, Inc. v. APS Contractors, Inc.*, 2015 WL 10489978, at *8 (N.J. Sup. Mar. 18, 2016) (quoting *Home Owners Constr. Co. v. Borough of Glen Rock*, 34 N.J. 305, 316 (1961)).

To support that NMAC waived the "prompt" payment provision, Defendants cite to Stefanidis'[3] statements that NMAC routinely accepted late payment for vehicle sales.  Opp'n at 9.  NMAC argues that the Court should disregard this testimony as unsupported, but does not explain how Stefanidis' personal knowledge does not support an inference of waiver.[4]  Reply at 9.  Further, it is not the Court's role to determine credibility or weigh the evidence; rather, the Court must

---

[3] The principal of all three Dealers.
[4] NNA separately moved for summary judgment as to Dealers' claims against NNA.  *See* D.E. 322.  However, NMAC adopts NNA's argument that the Court should disregard Stefanidis' declarations because the statements must be based on personal knowledge and cannot be mere legal conclusions.  Mot. at 7 n.2; *see* D.E. 322 at 2.  But, neither NMAC or NNA explain how that rule applies here to Stefanidis' statements.  *See* Mot. at 7 n.2; D.E. 322 at 2.

believe Defendants' evidence and draw all justifiable inference in their favor. *Marino*, 358 F.3d at 247. As such, if NMAC routinely accepted late payment for vehicle sales, a reasonable juror could find that NMAC's course of conduct constituted a waiver or modified the WFSAs' "prompt" payment provision and that NMAC's later conduct breached the contract first. *See Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (when facts could support an inference that the parties' course of conduct modified the contract, this issue should be left to the jury "to decide which interpretation of the facts [is] correct"). NMAC does not challenge Defendants' argument that if NMAC, not Dealers', breached the WFSAs, then the cross-default provisions in the other contracts would not have been triggered, and Defendants under those contracts would also not have breached. *See McGrath v. Poppleton*, 550 F. Supp. 2d 564, 573 (D.N.J. 2008) ("It is black letter contract law that one party's material breach excuses the other party from performing.").

Accordingly, the Court will **DENY** summary judgment motion on NMAC's breach of contract claim (Count Four) as to all alleged contracts and breaches. Relatedly, the Court will also **DENY** summary judgment on Defendants' counterclaim for breach of contract (Counterclaim Three).

### D. Defendants Have Not Waived Their Claims or Defenses Related to the Judicial Foreclosure Claim

NMAC argues that Defendants have waived any claims or defenses related to its claim for judicial foreclosure. Mot. at 19-20. Specifically, NMAC points to two guaranty provisions that it claims Judge Arleo, "has held" constitute waiver: (1) a provision included in guarantees signed by [Stefanidis and Demetrakis] in 2010, which states that the obligation to pay under the guaranty "shall be paid by the Guarantor regardless of . . . any defense, offset or counterclaim which may at any time be available to or asserted by Dealer or Guarantor or any other Guarantor"; and (2) a

11

provision in a personal guaranty executed by Demetrakis in 2011 that he "waives each of the following, to the fullest extent allowed by law: . . . (f) all other rights, defenses, offsets and counterclaims, the assertion of which would in any way diminish the liability of Guarantor hereunder." Arleo Op. at 11.

However, Judge Arleo expressly denied NMAC's motion to dismiss Defendants' counterclaims and defenses on this basis:

> [N]either [provision] clearly states that Defendants intended to completely waive all counterclaims. The first such provision . . . [which, pursuant to New Jersey Law, is to be strictly construed] against NMAC, [the party who insisted it was written,] it merely states that the Guarantor's obligation to pay will continue regardless of any counterclaim, not that Defendants will be precluded from later asserting any claim. The second . . . provision . . . merely purports to waive a counterclaim that would dimin9sh the liability of the Guarantor under the guaranty, not to forever preclude all claims. . . . Thus, the text of the two guarant[ees] NMAC cites do not unequivocally state that the parties intended to have Defendants forever waive[d] their counterclaims.

*Id.* Additionally, Judge Arleo found there was a "fact issue as to the scope of the waiver provisions" and that NMAC failed to specify which causes of action and defenses were covered by the guaranty agreements at issue. *Id.* at 12.

NMAC does not remedy this in its pending motion. Without any additional facts or specification as to how the alleged waiver impacts the claims, counterclaims, and defenses at issue, NMAC has not met its burden for summary judgment. *See Celotex Corp.* 477 U.S. at 323 (the moving party has the initial burden of establishing that there is no genuine dispute).

Accordingly, the Court will **DENY** summary judgment as to whether Defendants waived any claims or defenses related to NMAC's claim for judicial foreclosure (Count Six).

**E.  Because a Genuine Dispute of Material Fact Exists as to Whether Defendants Defaulted on the Loan Documents, the Court Cannot Grant Summary Judgment on the Judicial Foreclosure Claim**

NMAC seeks summary judgment on its judicial foreclosure claim (Count Six).  Mot. at 20. A prima facie right to foreclosure requires establishing (1) the validity of the loan agreement documents, (2) the alleged default, and (3) the right to foreclose.  *Id.* at 21 (citing *Great Falls v. Pardo*, 263 N.J. Super. 388 (Ch. Div. 1993), *aff'd*, 273 N.J. Super. 542 (App. Div. 1994)).  As for the second requirement, the alleged default, NMAC argues that there is "undisputed evidence of Defendants' failure to pay."  *Id.*  Defendants argue, and NMAC does not challenge, that whether the alleged default occurs depends on the "alleged cross default of the WFSAs, [which] first require[es] resolution at trial of the factual issues raised concerning the alleged default under the WFSAs."  Opp'n at 20.

Accordingly, because the Court has already found that there is a genuine dispute of material fact as to whether the alleged default occurred, the Court will **DENY** summary judgment on NMAC's judicial foreclosure claim (Count Six).

**F.  Genuine Disputes of Material Facts Preclude Summary Judgment on the Breach of the Implied Covenant of Good Faith and Fair Dealing Claim and Counterclaim (Count Five, Counterclaim Four).**

NMAC moves for summary judgment on both its own claim for breach of the implied covenant of good faith and fair dealing (Count Five) and Defendants' counterclaim for the same (Counterclaim Four).  Mot. at 22, 35.

New Jersey law implies a covenant of good faith into every contract.  *Kalogeras v. 239 Broad Ave., LLC*, 202 N.J. 349, 366 (2010).  This covenant prevents either party to a contract from engaging in conduct that "'will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]'"  *Id.* (quoting *Palisades Properties, Inc. v. Brunetti*, 44 N.J.

117, 130 (1965)).  "A party to a contract breaches the covenant if it acts in bad faith or engages in some other form of inequitable conduct in the performance of a contractual obligation."  *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 288 (3d Cir. 2000).

NMAC claims that Defendants breached this covenant "by engaging in extra-contractual schemes designed to evade repayment of indebtedness owed to NMAC, all done in bad faith[;] [s]pecifically, Defendants applied for and received millions of dollars in loan funding from NMAC and . . . Stefanidis and Demetrakis systematically prioritized repayment of their own 'loans' to Dealers or took distributions from Dealers without leaving sufficient capital to repay the monies owed to NMAC."  Mot. at 22-23 (citing D.E. 318-12 (check from Elite Bergenfield to Stefanidis)).

Defendants allege NMAC breached this covenant in a multitude of ways, such as (1) implementing the Rental Program and pressuring Dealers to take unwanted vehicles into their own name when the vehicles came off-lease; (2) coordinating stuffing efforts with NNA; and (3) knowingly making false promises of financial assistance, which ultimately led to the Dealers' demise and default.  Opp'n at 13 (citing, *e.g.*, D.E. 325-3 ("Brian Dep.") at 9-40; D.E. 326-12 to 14; D.E. 325-10 ("Carrion Dep.") at 86:17-87:23).   Further, Defendants argue that there can be no summary judgment as to either the claim or counterclaim because its counterclaims and NMAC's claims are intertwined, such that a finding on one claim or counterclaim could necessitate the outcomes on other claims and counterclaims.  *Id.*  For example, if one party breached a contract first, then the other party could not have breached that contract.  *See McGrath v. Poppleton*, 550 F. Supp. 2d 564, 573 (D.N.J. 2008) ("It is black letter contract law that one party's material breach excuses the other party from performing.").

Viewing the evidence in the light most favorable to Defendants, a genuine dispute of material fact exists as to which party breached the WFSAs first and how.  Where "a great big

14

material issue of fact looms[]" and the parties "respective versions [of events] are irreconcilable[,]"

"a district court should not grant summary judgment . . . ." *Dunkin Donuts Franchised Restaurants LLC v. Moussa*, 2009 WL 1883987, at *2 (D.N.J. June 30, 2009).  Rather, this case "should and will require" various parties to "get on the witness stand and take an oath and testify about what happened[,]" with the jury ultimately determining what took place.  *Id.*; *see also McGrath*, 550 F. Supp. 2 at 573; *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 2005 WL 147061, at *5 (D.N.J. Jan. 13, 2005) (expressing courts should not "speculate" on claims when issues must be "resolved conclusively" by the jury before further action can be taken).

Accordingly, the Court will **DENY** summary judgment motion on NMAC's breach of the implied covenant of good faith and fair dealing claim (Count Five) and Defendants' counterclaim for the same (Counterclaim Four).

### G.  Genuine Disputes of Material Fact Preclude Summary Judgment as to the Breach of Fiduciary Duty/Express Trust Claim

NMAC seeks summary judgment on its breach of fiduciary duty/express claim (Count Twelve).  Specifically, NMAC argues that "[t]he WFSAs created a trust arrangement that De[alers] breached" because (1) after Dealers' alleged default, they did not hold "all proceeds from the sale or disposition of vehicles . . . separate from its own funds in trust for NMAC" and (2) "regardless of whether . . . default . . . occurred, all property received by Dealers, including proceeds, that belong to or that is to be delivered to NMAC shall be received by Dealer in trust for NMAC and shall be paid to NMAC immediately."  Mot. at 24 (cleaned up).

The creation of an express trust requires three elements: (1) a declaration of trust, (2) a clearly defined trust res, and (3) the intent to create a trust relationship.  *In re Mason*, 2021 WL 1207780, at *5 (D.N.J. Mar. 31, 2021).  "A trust is defined as a fiduciary relationship with respect to property, subjecting the person with legal title to equitable duties to deal with the property for

the benefit of another [party], which arises as a result of a manifestation of an inten*tio*n to create it." *Id.* (internal quotation marks omitted).

NMAC claims that the WFSAs created this express trust and, consequently, fiduciary duties. Mot. at 24. However, as the Court previously noted (*supra* III.C), there is a genuine dispute of material fact as to whether NMAC or Dealers breached the WFSAs. The disposition of that issue impacts whether Dealers defaulted and whether Dealers were obligated to fulfill their obligations under the WFSAs, which precludes summary judgment. *See Dunkin Donuts*, 2009 WL 1883987, at *2 ("a district court should not grant summary judgment " where the parties "respective versions [of events] are irreconcilable" and resolution of a material fact impacts the outcome of other claims and counterclaims). Accordingly, the Court will **DENY** summary judgment on NMAC's breach of fiduciary duty/express trust claim (Count Twelve).

### H. Fraudulent Transfer

NMAC moves for summary judgment on its fraudulent transfer claim (Count Thirteen). Mot. at 25. A fraudulent transfer claim requires proof of (1) "whether the debtor has put some asset beyond the reach of creditors which would have been available to them at some point in time but for the conveyance" and (2) "whether the debtor transferred property with an intent to defraud, delay, or hinder the creditor." *Gilchinsky v. Nat. Westiminster Bank N.J.* 159 N.J. 463, 475-76 (1999) (cleaned up). Because "direct proof of actual fraudulent intent is rare[,]" courts look to "a non-exclusive list of factors, or 'badges of fraud,' for determining actual intent." *In re Truong*, 285 F. App'x 837, 839 (2008). These "badges of fraud" are:

> a. The transfer or obligation was to an insider;
> b. The debtor retained possession or control of the property transferred after the transfer;
> c. The transfer or obligation was disclosed or concealed;
> d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e. The transfer was of substantially all the debtor's assets;
f. The debtor absconded;
g. The debtor removed or concealed assets;
h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and
k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

NJSA § 25:2-26. A court "should balance the[se] factors[,] . . . as well as any other factors relevant to the transaction." *Gilchinsky*, 159 N.J. at 477. Typically, "[t]he question of a person's intent" under this statute is "ill-suited for disposition at summary judgment . . . ." *United States v. Bradley*, 2020 WL 244008, at *2 (D.N.J. Jan. 16, 2020). And "a transfer is not voidable . . . against a person who took in good faith and for a reasonably equivalent value." NJSA § 25:2-30(a).

NMAC argues three badges are present here: (1) the transfer was to an insider, (2) the debtor removed assets, and (3) the debtor became insolvent shortly after the transfer. Mot. at 26. Additionally, NMAC argues s"[i]t is undisputed that NMAC loaned Defendants millions via various loans and perfected its interests such that NMAC was a protected first-priority lender[,]" and "Demetrakis and Stefanidis consistently misappropriated Dealers' funds by self-dealing and prioritized their own financial well-being over NMAC." *Id.* NMAC cites three examples of this conduct. First, "on November 9, 2018, Elite Bergenfield received $118,000 for the sale of eight NMAC-financed vehicles that were never paid off[,]" and "[o]n the same day, Elite Bergenfield wrote Stefanidis a check for $125,000." *Id.* (citing 318-12 (check)); *see also id.* at 11 (citing 318-11, 318-13). Second, "on September 20, 2018," "Infiniti of Englewood received $4,000,000 from 800 E. Street, LLC, . . . and on September 21, 2018[,] that exact amount was wired to Demetrakis." *Id.* (citing D.E. 313-21). And third, in July 2018, Elite Bergenfield paid Demetrakis over $800,000

pursuant to a CAP loan NMAC had approved for Elite Bergenfield. *Id.* at 12 (citing D.E. 313-19 and D.E. 310-2 (affidavit of Jason Langner, the current Consumer Credit Manager for NMAC)). In response, Defendants claim that Stefanidis and Demetrakis both made "practically contemporaneous," equivalent, and "continuous deposits over the years" related to the misconduct alleged by NMAC, which Defendants claim "exceed $15 million" in 2018 alone. Opp'n at 19-20 (citing 326-1 through 7 (various bank statements); 325-2 ("Demetrakis Dep.") at 224:7-225-8).

Drawing all reasonable inferences in favor of Defendants, a reasonable juror could find that Stefanidis and Demetrakis' deposits to be equivalent and close enough in time to find there was no fraudulent intent. *See Bradley*, 2020 WL 244008, at *2 (determining fraudulent intent is "ill-suited" for summary judgment).

Accordingly, the Court will **DENY** NMAC's summary judgment motion as to its fraudulent transfer claim (Count Thirteen).

## I. Fraudulent Inducement, Equitable Fraud, and Promissory Estoppel Counterclaims

NMAC moves for summary judgment on Defendants' counterclaims of fraudulent inducement (Counterclaim One), equitable fraud (Counterclaim Three), and promissory estoppel (Counterclaim Five). Mot. at 28-37. Each counterclaim arises from Defendants' allegations surrounding the formation of the Forbearance Agreement. *See id.*; *see also* Stefanidis Dec. ⁋ 43 (describing the parties meeting at the restaurant prior to entering the Forbearance Agreement).

1. Summary judgment on the fraudulent inducement claim is not warranted because there is a genuine dispute of material fact as to whether NMAC knew its promises were false when it made them

NMAC seeks summary judgment on Defendants' fraudulent inducement counterclaim (Counterclaim One), which asserts that NMAC fraudulently induced Defendants to sign the Forbearance Agreement. A fraudulent inducement counterclaim must allege: (1) a material

misrepresentation of a presently existing or past fact, (2) the party making the misrepresentation had knowledge or belief of its falsity, (3) that same party intended that the other party rely on the misrepresentation, (4) reasonable reliance by the other party, and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997). Because Defendants' counterclaim alleges a misrepresentation of NMAC's intent to perform a future action, Defendants must allege facts suggesting that the promisor knew the statement was false when made, which can include the circumstances surrounding the transaction. *See Malek v. Chef's Roll, Inc.*, 2019 WL 3854303, at *11 (D.N.J. Aug. 16, 2019). "Mere proof of nonperformance" of the promise does not establish fraudulent intent. *Ocean Cape Hotel Corp. v. Masefield Corp.*, 63 N.J. Super. 369, 382 (App. Div. 1960).

NMAC argues that Defendants fail to provide any factual support that NMAC knew any alleged promises were false when made. *See* Reply at 13 (arguing the fraudulent inducement claim fails as a matter of law). However, Defendants cite to the following evidence regarding these promises: (1) Kaczynski made a "verifiable falsehood" that Dealers were free to choose their own insurance provider, and (2) Carrion, an employee, testified that "he was specifically instructed . . . not to provide assistance to the Dealers to enable them to maintain their operations." Opp'n at 16 (citing D.E. 316-18 ("Kaczynski Dep.") at 16:17-17:3; Carrion Dep. at 86:17-87:23). A reasonable juror could find these circumstances indicate prior knowledge of the verifiable falsehood, and that prior knowledge, plus instructions to not assist Dealers, demonstrate that there was never an intent to help Dealers. Issues of credibility as to the varying testimony are not appropriate for the Court to decide on summary judgment. *Travelodge Hotels, Inc. v. Honeysuckle Enters., Inc.*, 357 F. Supp. 2d 788, 799-800 (D.N.J. 2005).

Accordingly, the Court will **DENY** summary judgment as to Defendants' fraudulent inducement counterclaim (Counterclaim One).

2.   There is a genuine dispute of material fact as to the equitable fraud counterclaim

NMAC also seeks summary judgment on Defendants' equitable fraud counterclaim (Counterclaim Two), which asserts that NMAC committed equitable fraud when entering into the Forbearance Agreement. Mot. at 32.

"The elements of equitable fraud are the same as those of common law fraud, except that scienter, or 'knowledge of the falsity and an intention to obtain an undue advantage therefrom,' is not required." *Carrow v. Fedex Ground Package Sys., Inc.*, 2017 WL 1536411, at *2 (D.N.J. Apr. 26, 2017) (quoting *Jewish Ctr. of Sussex Cty. v. Whale*, 86 N.J. 619, 625 (1981)). Thus, an equitable fraud claim consists of "a material representation of a presently existing or past fact" that the other party relied on to its detriment. *Jewish Ctr.*, 86 N.J. at 625.

Equitable fraud requires an equitable remedy, such as rescission or reformation of an agreement, rather than monetary damages. *See Jewish Ctr.*, 86 N.J. at 625. In some instances, "[a] court may decline to impose an equitable remedy if such relief is neither realistic nor fair." *Dalton v. Shanna Lynn Corp.*, 2012 WL 1345073, at *7 (N.J. Sup. Apr. 19, 2012). Defendants seek rescission, which seeks, to the extent possible, seeks to return parties to the position they were in prior to the contract. *Ray v. Beneficial Finance Co. of North Jersey*, 92 N.J. Super. 519, 539 (1966); *see also Notch View Assocs. v. Smith*, 260 N.J. Super. 190, 197-98 (1992) ("[T]o grant rescission, the court must be able to return the parties to their original position . . . in so far as practicable.").

First, NMAC argues this is not possible because under the Forbearance Agreement, "NMAC gave Dealers additional time pay their outstanding debts and multiple loans . . . [and] in

exchange, Dealers gave NMAC promises to pay the loan, dismiss NMAC from the Insurance Litigation, and waive any potential defenses." Mot. at 32-33. Thus, "[w]ere the Court to rescind the [] Forbearance Agreement, NMAC would be worse off . . . [because] NMAC has lost the time that it gave as consideration." *Id.* at 33. In response, Defendants argue that the consideration NMAC gave was not the additional time, but "the various [oral] promises" made to induce Defendants to enter the Forbearance Agreement, such as to pay the insurance claim, remove Dealers from special credit, and provide CAP Loans in a way that benefitted Dealers. Opp'n at 25, 29. In support, Defendants cite to Stefanidis and Demetrakis' declarations, which contain personal knowledge of "the date, time[,] and place of a specific conversation with officers of NMAC wherein NMAC made [these] oral promises . . . ." *Id.* at 25; *see, e.g.*, Stefanidis Decl. ¶ 43 (detailing a dinner conversation where these promises were made).

Given the conflicting versions of events, there is a genuine dispute of material fact as to what promises were made surrounding the Forbearance Agreement. Accordingly, the Court cannot determine whether rescission would fall short of practicably returning parties to their positions before contracting. *See Notch View*, 260 N.J. Super. at 198.

NMAC additionally argues that Defendants cannot seek equitable relief because they do not have "'clean hands'" because of their "multiple schemes to defraud NMAC and enrich themselves . . . ." Mot. at 33 (quoting *A Hollander & Son, Inc. v. Imperial Fur Blending Corp.*, 2 N.J. 235, 246 (1949) (The party seeking equitable relief must "come into court with clean hands and he must keep them clean after his entry and throughout the proceedings.")). Defendants argue that the "innumerable" genuine disputes of material facts as to the other claims at issue in this case "draw [NMAC's] position into serious question . . . ." Opp'n at 30.

21

The Court agrees that the above genuine dispute of material facts also creates a genuine dispute of material fact as to whose hands, if any, are clean.  Accordingly, the Court will **DENY** summary judgment as to the equitable fraud claim (Counterclaim Two).

3.   There is a genuine dispute of material fact as to the promissory estoppel counterclaim

Lastly, NMAC seeks summary judgment as to Defendants' promissory estoppel counterclaim (Counterclaim Five).  Mot. at 37-38.  The elements of a promissory estoppel claim are: (1) a clear and definite promise by the promisor, (2) the promisor made the promise with the expectation that the promise would induce reliance by the promisee, (3) the promisee reasonably relied on the promise, and (4) the promisee experienced a substantial and definite determent because of reliance on the promise.  *Pitak v. Bell Atl. Network Servs.*, 928 F. Supp. 1354, 1367 (D.N.J. 1996).

NMAC argues that Defendants' allegations as to the promises NMAC made in connection with the Forbearance Agreement are "baseless."  Mot. at 38.  However, as noted above, the conflicting versions of events, both factually supported, creates a genuine dispute of material fact. Accordingly, the same genuine dispute of material fact exists as to the promissory estoppel claim. *See Travelodge Hotels*, 357 F. Supp. 2d at 799-800 (noting the similarity of proof for the fraudulent inducement, equitable fraud, and promissory estoppel claims and denying summary judgment because "[t]here is evidence in the record suggestive of misrepresentations as to fact" and these claims "also implicate issues of credibility that are not proper for a court to decide on summary judgment").

Accordingly, the Court will **DENY** summary judgment as to the promissory estoppel counterclaim (Counterclaim Five).

**IV.    CONCLUSION**

22

For the reasons stated above, the Court will **DENY** NMAC's summary judgment motion.

An appropriate Order accompanies this Opinion.

Dated: June 26, 2023

Evelyn Padin, U.S.D.J.